**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

U. S. SECURITIES AND EXCHANGE
COMMISSION,

          Plaintiff,                           Civil Action No.

    v.

ONYX CAPITAL ADVISORS, LLC,
ROY DIXON, JR. and MICHAEL A. FARR,

          Defendants.

_____/

## <u>COMPLAINT</u>

Plaintiff, the United States Securities and Exchange Commission ("Commission"), complains and alleges as follows:

### SUMMARY

1.    The Commission brings this action to stop an ongoing fraud by Roy Dixon, Jr. ("Dixon"), an investment adviser, and Onyx Capital Advisors, LLC ("Onyx Capital"), his private equity firm, against three Detroit-area public pension funds that invested $23.8 million in a private equity fund known as Onyx Capital Advisory Fund I, LP ("Onyx Fund"). Dixon and Onyx Capital have misappropriated more than $3.11 million from the Onyx Fund.

2.    Michael A. Farr ("Farr"), a friend of Dixon's, provided substantial assistance to Dixon and Onyx Capital in these misappropriations. Farr controls three related businesses -- Second Chance Motors, Inc. ("Second Chance"), SCM Credit, LLC ("SCM Credit") and SCM Finance, LLC ("SCM Finance") -- that received around 80% of the money invested through the Onyx Fund. Farr's improper actions included diverting money invested in the Second Chance

entities to another company he owned, withdrawing cash to give to Dixon and making payments to the construction companies building a new multi-million dollar house for Dixon.

3.      In addition, Dixon and Onyx Capital have made numerous false and misleading statements to the pension funds.  For example, Dixon and Onyx Capital sent a forged letter to one of the pension funds misrepresenting the principals of Onyx Capital.  Dixon and Onyx Capital also have issued false and misleading capital calls to and misrepresented the amount of management fees that Onyx Capital received from the Onyx Fund.

4.      Dixon and Onyx Capital have violated and, unless enjoined, will continue to violate the Securities Act of 1933 ("Securities Act"), the Securities Exchange Act of 1934 ("Exchange Act") and the Investment Advisers Act of 1940 ("Advisers Act").

5.      Farr has aided and abetted and, unless enjoined will continue to aid and abet, Dixon's and Onyx Capital's violations of the Advisers Act.

6.      The Commission brings this action in order to halt Defendants' fraudulent activities, prevent further harm to investors, to hold Dixon, Onyx Capital and Farr accountable for their violations of the federal securities laws and to require Defendants disgorge their ill-gotten gains and pay prejudgment interest and civil penalties.

## JURISDICTION AND VENUE

7.      The Court has jurisdiction over this action pursuant to Sections 20 and 22 of the Securities Act [15 U.S.C. §§ 77t and 77v], Sections 21 and 27 of the Exchange Act [15 U.S.C. §§ 78u and 78aa] and Sections 209 and 214 of the Advisers Act [15 U.S.C. §§ 80b-9 and 80b-14].  Dixon and Onyx Capital have, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities

exchange in connection with the acts, practices and courses of business alleged in this Complaint.

8.     Venue is proper in this judicial district pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa] and Section 214 of the Advisers Act [15 U.S.C. §80b-14] because some of the acts, transactions and courses of business constituting the violations alleged in this Complaint occurred within the jurisdiction of the United States District Court for the Eastern District of Michigan.

### DEFENDANTS

9.     **Roy Dixon, Jr.** is 46 years old and resides primarily in Atlanta, Georgia.  He also owns homes in Plymouth, Michigan and Naples, Florida.  Dixon is the owner and founding member of Onyx Capital, a private equity firm based in Detroit, Michigan.  Dixon is a licensed securities broker and has been employed as a registered representative at a broker-dealer based in Bloomfield Hills, Michigan.  Dixon also owns an insurance business named Onyx Financial Group, LLC, located in Detroit, Michigan, as well as numerous rental properties in Detroit and Pontiac, Michigan.

10.     **Onyx Capital Advisors, LLC** is a Delaware company with its principal office in Detroit, Michigan.  Dixon founded Onyx Capital in September 2006 and is its sole owner.  Since 2007, Onyx Capital has managed assets for three Detroit-area public pension funds through its position as the general partner for the Onyx Fund, a private equity fund.

11.     **Michael A. Farr** is 42 years old and resides in Atlanta, Georgia.  Farr is the President, CEO and sole owner of Second Chance Motors, Inc.  Farr also controls the operations of two related companies, SCM Credit, LLC and SCM Finance, LLC, both of which provide financing support to Second Chance.  Farr and his wife also own 1097 Sea Jay, LLC.

3

## OTHER RELATED ENTITIES

12.     **Onyx Capital Advisory Fund I, LP** is a Delaware limited partnership formed in June 2007 for the purpose of investing in private companies.  Since that time, Onyx Capital has acted as the general partner to the Onyx Fund.  In 2008, Onyx Capital created Onyx Intelligence Solutions, LLC ("Onyx Intelligence") as a wholly-owned subsidiary of the Onyx Fund to serve as a holding company for the Onyx Fund's investment in a technical staffing company called Hi-Tec Associates, Inc. ("Hi-Tec").

13.     **Second Chance Motors, Inc.** ("Second Chance") is registered as both a Michigan and a Delaware corporation with its principal place of business in Conyers, Georgia. Farr created Second Chance in 2002 as a series of used car dealerships located in Georgia, Michigan, North Carolina and Texas.  Second Chance and the Onyx Fund are the owners of SCM Credit and SCM Finance.

14.     **SCM Credit, LLC** ("SCM Credit") is a Georgia company with its principal place of business in Conyers, Georgia.  Farr organized SCM Credit in February 2006 to provide in-house auto financing for the customers of Second Chance.  As of December 31, 2009, the Onyx Fund owned 80% of SCM Credit; Second Chance owned the remaining 20%.

15.     **SCM Finance, LLC** ("SCM Finance") is a Georgia company with its principal place of business in Conyers, Georgia.  Farr started SCM Finance in February 2006 to provide Second Chance dealerships with in-house financing for their inventory of used cars.  As of December 31, 2009, the Onyx Fund owned 52% of SCM Finance; Second Chance owned the remaining 48%.

16.   **1097 Sea Jay, LLC** ("Sea Jay") is a Georgia company with its principal place of business in Conyers, Georgia.  Farr formed Sea Jay in September 2007.  Sea Jay owns a single piece of real estate that it rents to one of Second Chance's dealerships.

## FACTS

### I.   <u>Dixon and Onyx Capital Solicit Investors and Capital for the Onyx Fund.</u>

17.   Dixon founded Onyx Capital in September 2006.  Onyx Capital's website claims that the company is a "private equity firm that provides expansion capital to rapidly growing small and mid-sized businesses with market leading potential."

18.   Shortly after founding Onyx Capital, Dixon began soliciting Michigan public pension funds to invest in the Onyx Fund, a start-up private equity fund, and the only fund managed by Onyx Capital.

19.   The Onyx Fund created a private placement memorandum to advise potential investors that the Fund would invest in "equity and, in certain cases, mezzanine securities of a diverse portfolio of companies across a variety of industries."

20.   Dixon and Onyx Capital told at least one potential investor that the Onyx Fund would invest primarily in Midwest-based companies -- and would place no more than 20% of its assets in a single company.

21.   By June 2007, three Detroit-area public pension funds had agreed to invest a total of $25 million in the Onyx Fund.  Dixon and Onyx Capital were unsuccessful in obtaining any further commitments.

22.   The three Detroit-area pension funds executed a partnership agreement with Onyx Capital in June 2007.  Onyx Capital became the general partner of the Onyx Fund, and the three Detroit-area pension funds were the limited partners.

23.     The partnership agreement permitted Onyx Capital to issue "capital calls" to the pension fund investors, as needed, to fund a particular investment or to pay management fees. According to the agreement, for each capital call Onyx Capital was required to describe the anticipated use of the funds requested and seek the funds *pro rata* from each pension fund based on its capital commitment.

24.     Between June 2007 and June 2009, the three pension funds contributed a total of approximately $23.8 million to the Onyx Fund.

25.     Between July 2007 and September 2009, Dixon and Onyx Capital invested approximately $19.7 million of the money contributed to the Onyx Fund in five companies.  Of these investments, Dixon and Onyx Capital invested approximately $15.7 million, or 80% of the total, in three companies controlled by Dixon's friend Michael Farr:  *i.e.*, Second Chance, SCM Credit and SCM Finance.

26.     Dixon and Onyx Capital invested the contributions to the Onyx Fund as follows:

| Contributions | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|
| Pension I (40%) | $2,745,749 | $7,254,251 | 0 | $10,000,000 |
| Pension II (40%) | $2,745,749 | $7,200,000 | 0 | $9,945,749 |
| Pension III (20%) | $51,583 | $2,357,200 | $1,486,000 | $3,894,783 |
| | $5,543,081 | $16,811,451 | $1,486,000 | $23,840,532 |

| Investments | 2007 | 2008 | 2009 | Totals |
|---|---|---|---|---|
| Second Chance | $1,967,000 | 0 | 0 | $1,967,000 |
| SCM Finance | $1,000,000 | $1,145,000 | $128,000 | $2,273,000 |
| SCM Credit | 0 | $5,259,477 | $6,230,000 | $11,489,477 |
| Galaxy Aero | 0 | $350,000 | 0 | $350,000 |
| Hi-Tech | 0 | $3,653,278 | 0 | $3,653,278 |
| | $2,967,000 | $10,407,755 | $6,358,000 | $19,732,755 |

27.     Currently, Onyx Capital and the Onyx Fund hold approximately $155,000 in cash.

**II.**   **Dixon and Onyx Capital Made Misrepresentations to the Pension Funds**

28.     Since 2007, Dixon and Onyx Capital have made a number of false and misleading statements to the three Detroit-area pension funds, which included misrepresentations regarding the principals of Onyx Capital, and the issuance of false and misleading capital calls.

**A.**        **Misrepresentations Regarding the Principals of Onyx Capital**

29.     While soliciting investments for the Onyx Fund, Dixon and Onyx Capital assured at least one the three pension funds that, although Dixon had no prior experience managing a private equity fund, he would work closely with a friend who had substantial experience evaluating private equity investments.

30.     During initial discussions about investing in the Onyx Fund, Pension Fund III asked Dixon on several occasions whether his friend was a principal of Onyx Capital.  Several of Pension Fund III's trustees stated during public meetings that they would not be comfortable investing in the Onyx Fund unless Dixon's friend became one of Onyx Capital's principals, because the firm did not have sufficient investment experience without him.

31.     Dixon repeatedly told Pension Fund III that his friend was committed to joining Onyx Capital on a full-time basis, and simply needed to complete a project for his current employer.

32.     After Pension Fund III executed the partnership agreement in June 2007, it refused to fund Onyx Capital's first two capital calls until the pension fund received a written assurance that Dixon's friend was, in fact, a principal of Onyx Capital.  Pension Fund III also requested additional information regarding Onyx Capital's proposed "organizational expenses."

33.     In November 2007, Onyx Capital sent a letter to Pension Fund III purportedly signed by Dixon, his friend and another individual.  The letter stated that the three men jointly owned 100% of Onyx Capital and that 100% of their efforts were with the firm.

34.     Dixon's friend, however, never signed or authorized anyone else to sign the November 2007 letter.

35.     In addition, the substance of the November 2007 letter was false.  Although Dixon's friend had reviewed certain investment opportunities for the Onyx Fund during his spare time, he never owned or was employed by Onyx Capital, and instead had been working full-time for another company since 1996.

36.     After receiving Onyx Capital's November 2007 letter, Pension Fund III's Board of Trustees made a payment in a negotiated amount for organizational expenses and agreed to proceed with its investment in the Onyx Fund.

37.     In June 2009, a Detroit-area newspaper reported that Dixon's friend had identified the signature on Onyx Capital's November 2007 letter as a forgery, and that Dixon's friend had never been an employee of Onyx Capital.

38.     After officials from Pension Fund III saw the newspaper article, they refused to fund any additional capital calls in the Onyx Fund, and froze the pension fund's investment at its current level.

**B.      False and Misleading Capital Calls**

39.     Dixon and Onyx Capital never made a single capital call to the pension funds on a *pro rata* basis as required by the partnership agreement.  Instead, Dixon and Onyx Capital issued the following capital calls to the pension funds:

| Date | Stated Purpose | Pension I (40%) | Pension II (40%) | Pension III (20%) |
|------|---------------|-----------------|------------------|-------------------|
| June 2007 | Organizational Expenses | 195,749 | 195,749 | 145,875* |
| July 2007 | Investment | 1,400,000 | 1,400,000 | 594,000* |
| Oct. 2007 | Investment | 1,150,000 | 1,150,000 | |
| Nov. 2007 | Organizational Expenses | | | 51,583 |
| April 2008 | Investment | 500,000 | 350,000 | |
| May 2008 | Management Fee | | | 100,000 |
| May 2008 | Investment | 1,750,000 | 1,750,000 | 1,653,300 |
| Aug. 2008 | Investment | 1,100,000 | 1,100,000 | |
| Oct. 2008 | Investment | 500,000 | 500,000 | 603,900 |
| Dec. 2008 | Investment | 3,404,251 | 3,500,000 | |
| Jan. 2009 | Investment | | | 1,386,000 |
| April 2009 | Management Fee | | | 100,000 |
| * These two capital calls were never paid.  Instead Pension Fund III paid a lesser, negotiated amount for the requested expenses. | | | | |

40.     In each capital call issued to Pension Fund III, Dixon and Onyx Capital misrepresented the actual amounts which had been requested from the other two pension funds.

41.     For example, in a January 15, 2009 capital call, Dixon and Onyx Capital advised Pension Fund III that they had requested $2.77 million each from the other two pension funds for a $7 million investment in a particular auto finance company.  In reality, Dixon and Onyx Capital already had requested and received approximately $3.5 million each from the other two pension funds for the investment.  By misstating the amounts actually invested by the other two pension funds, Dixon and Onyx Capital raised an additional $1.29 million from a transaction they described as a $7 million investment.

42.     In March 2009, the intended investment in the auto finance company fell through. However, Dixon and Onyx Capital also failed to inform the pension funds that the investment had failed, or that they subsequently had invested the money intended for this investment into

SCM Credit. In fact, Dixon and Onyx Capital have never disclosed these facts to Pension Funds I and II. Defendants did not reveal this change in investments to Pension Fund III until August 2009 when the accountants for this pension fund specifically questioned Dixon about the Onyx Fund's financial statements.

### III.   Dixon and Onyx Capital Misappropriated Money from the Onyx Fund

43.    Shortly after the three Detroit-area pension funds made their first contributions to the Onyx Fund in 2007, Dixon and Onyx Capital began misappropriating money from the Fund.

44.    Between 2007 and 2009, Dixon and Onyx Capital misappropriated approximately $3.11 million from the Onyx Fund. They took more than $2.06 million in excess management fees. In addition, Farr assisted Dixon and Onyx Capital in misappropriating almost $1.05 million through the Onyx Fund's purported investments in companies Farr controlled.

45.    Dixon used the proceeds from his and Onyx Capital's misappropriations to pay personal and business expenses. These expenses included payments for the construction of Dixon's multimillion-dollar house in Atlanta, Georgia, and mortgage payments on more than forty rental properties Dixon owns in Detroit and Pontiac, Michigan.

#### A.   Misappropriation of Excess and Advance Management Fees

46.    Between 2007 and 2009, Dixon and Onyx Capital misappropriated at least $2.06 million from the Onyx Fund under the guise of management fees.

47.    The partnership agreement for the Onyx Fund provided that Onyx Capital was entitled to receive an annual management fee of 2% of the committed capital within the Fund, or $500,000 each year, payable on a quarterly basis.

48.     Instead of deducting Onyx Capital's management fees on a quarterly basis as required by the partnership agreement, Dixon withdrew money from the Onyx Fund whenever he desired.

49.     On at least fifteen occasions between 2007 and 2009, Dixon withdrew investor money from the Onyx Fund's bank accounts to cover overdrafts in his own personal accounts, or Onyx Capital's bank accounts.

50.     Onyx Capital has taken excess management fees from the Onyx Fund each year since its inception.  Between 2007 and 2009, Onyx Capital charged the Onyx Fund for at least $1.74 million in management fees – above and beyond the amounts it was entitled to receive under the partnership agreement.

51.     Onyx Capital characterized the withdrawal of these excess fees as either "related party receivables" or "advance management fees" in the Onyx Fund's general ledger.  However, the partnership agreement expressly prohibited the general partner from borrowing or taking any advance fees from the Onyx Fund.

52.     Between 2008 and 2009, Dixon and Onyx Capital also obtained $200,000 in excess management fees from Pension Fund III by double-billing it separately for management fees that Onyx Capital already had withdrawn from the Onyx Fund.  Dixon deposited the 2008 payment of $100,000 into Onyx Capital's bank account.  Dixon deposited the 2009 payment of $100,000 into his own, personal bank account.

53.     In addition, between 2007 and 2009 Dixon personally withdrew at least $920,000 from the Onyx Fund's bank accounts and deposited that money into his personal bank accounts or the bank accounts of other businesses he owned.  Dixon subsequently re-deposited $800,000 of these funds back into the Onyx Fund's accounts.

54.     Dixon and Onyx Capital have taken a number of steps to prevent the pension funds from discovering their misappropriations from the Onyx Fund.  Among other things, Dixon and Onyx Capital have disregarded the requirements of the partnership agreement and have failed to provide the pension funds with copies of the Onyx Fund's tax returns for 2007 and 2008.  Those tax returns identified some of the excess management fees taken by Onyx Capital as a related party receivable.  Dixon and Onyx Capital also sent each of the pension funds an annual Investor's Report in August 2008, and several quarterly account statements, which falsely stated that Onyx Capital had been paid only the management fees that it was entitled to receive under the partnership agreement.

**B.     Misappropriations Through Michael Farr, SCM Credit And SCM Finance**

55.     Dixon and Michael Farr have been friends since before Dixon started Onyx Capital.  In fact, Dixon selected Farr's father to serve on the Onyx Fund's initial advisory board.

56.     The first investments which Dixon and Onyx Capital made on behalf of the Onyx Fund were in Farr's used car dealerships and related finance companies.  Between July 2007 and January 2008, the Onyx Fund agreed to invest a total of $4.25 million in Second Chance, SCM Credit and SCM Finance ("the Second Chance entities").

57.     However, after entering into these agreements, Dixon and Onyx Capital transferred funds in excess of agreed amounts to SCM Credit and SCM Finance.  The Onyx Fund did not execute new investment agreements, showing an additional debt or equity investment with these two entities, until the end of 2008 and the end of 2009.

58.     The Second Chance entities treated the money obtained from the Onyx Fund as if it was a line of credit.  By the end of 2009, Dixon and Onyx Capital had transferred approximately $15.7 million to the Second Chance entities.

59.     Farr knew that the money that the Second Chance entities were receiving from Dixon and Onyx Capital came from public pension funds, and that the money was transferred for investment purposes.   In August 2008, Farr attended a meeting with the Board of Trustees of Pension Fund III, and the Onyx Fund's investments in the Second Chance entities were discussed at that meeting.

60.     Beginning in 2008, Dixon coordinated additional misappropriations from the Onyx Fund with Farr.  In total, Dixon and Farr misappropriated approximately $1.05 million of the money the Onyx Fund purportedly invested in Farr's companies.

61.     Between June 2008 and November 2009, Farr transferred approximately $2.34 million from the Second Chance entities to Sea Jay, a company owned by Farr.  Sea Jay's only asset was a piece of real property leased to one of Second Chance's used car dealerships for $10,000 per month.  Sea Jay had the right to receive a total of $230,000 from the Second Chance entities for this purpose.   The Second Chance entities had no legitimate business purpose to transfer an additional $2.11 million to Sea Jay.

62.     Farr assisted Dixon in misappropriating approximately $948,000 of the investor funds which had been transferred to Sea Jay.  Farr later returned $1.16 million of the money transferred into Sea Jay to the Second Chance entities.  Of the approximately $948,000 which Dixon and Farr misappropriated, $719,000 was used to benefit Dixon and $229,000 was used to benefit Farr.

63.     Between October and December 2008, Farr made approximately $522,000 in payments from Sea Jay's bank account to three construction companies that performed work on Dixon's new house in Atlanta.  On December 30, 2008, Farr and Dixon executed a promissory note pursuant to which Dixon was not required to repay any amount to Sea Jay for six years.

64.     During December 2008, Farr also made a series of cash withdrawals from Sea Jay's bank account at approximately the same date and time, and in the same locations, as Dixon made cash deposits.  Over the course of approximately two weeks, Farr and Dixon made at least 25 corresponding cash transactions in banks near Atlanta, Georgia and Naples, Florida where they both own homes.  On many of these days, Farr and Dixon made similar withdrawals and deposits of cash on the same day.

65.     In addition, Farr misappropriated at least $100,000 of the money invested in his businesses by the Onyx Fund through one of Second Chance's used car dealerships, Second Chance Motors of Houston, LLC ("SCM Houston").  On December 29, 2008, Dixon transferred $125,000 from the Onyx Fund to SCM Credit for investment purposes.  Farr immediately transferred $100,000 of that money to SCM Houston.  The next day, Farr withdrew $100,000 in cash from SCM Houston's account at a bank in Estero, Florida and Dixon deposited $130,000 in cash into Onyx Capital's account at a bank located approximately 20 miles away.

66.     The following chart summarizes Farr's and Dixon's cash transactions between December 15, 2008 and December 31, 2008:

| Date | Location | Account | Withdrawal | Account | Deposit |
|---|---|---|---|---|---|
| | | | | | |
| 12/15/2008 | Georgia | Sea Jay | $50,000 | | |
| 12/16/2008 | Georgia | | | Dixon | $9,000 |
| 12/17/2008 | Georgia | | | Dixon | $9,000 |
| 12/19/2008 | Georgia | | | Dixon | $9,200 |
| 12/19/2008 | Georgia | | | Dixon | $5,000 |
| 12/22/2008 | Georgia | Sea Jay | $50,000 | Onyx Capital | $9,500 |
| 12/23/2008 | Georgia | | | Dixon | $9,000 |
| 12/23/2008 | Georgia | | | Dixon | $9,000 |
| 12/23/2008 | Georgia | | | Onyx Capital | $9,500 |
| 12/23/2008 | Florida | Sea Jay | $30,000 | | |
| 12/24/2008 | Florida | Sea Jay | $8,000 | Onyx Fund | $30,000 |
| 12/26/2008 | Florida | Sea Jay | $20,000 | | |
| 12/26/2008 | Florida | Sea Jay | $10,000 | | |

| | | | | | |
|---|---|---|---|---|---|
| 12/26/2008 | Florida | Sea Jay | $5,000 | | |
| 12/26/2008 | Michigan | | | Onyx Capital | $19,000 |
| 12/29/2008 | Michigan | | | Onyx Capital | $8,000 |
| 12/29/2008 | Florida | Sea Jay | $50,000 | Onyx Capital | $24,000 |
| 12/30/2008 | Florida | SCM Houston | $100,000 | Onyx Capital | $130,000 |
| 12/30/2008 | Michigan | | | Onyx Fund | $8,000 |
| 12/31/2008 | Florida | Sea Jay | $50,000 | | |
| 12/31/2008 | Michigan | | | Onyx Capital | $8,500 |
| | | | | | |
| | | **Totals:** | $373,000 | | $296,700 |

67.     Dixon used most of the December 2008 cash deposits so that it would appear to the Onyx Fund's auditor that Onyx Capital had repaid the excess management fees it had withdrawn from the Onyx Fund during 2008.  In this manner, Dixon and Onyx Capital were able to avoid reporting any excess management fees as a related party receivable on the Onyx Fund's tax return and audited financial statements for 2008.

68.     Finally, Farr commingled the funds invested by the Onyx Fund among the three Second Chance entities and Sea Jay – which between them maintained at least 38 bank accounts at seven separate banks.  On several occasions, Farr made at least ten transfers between and among these bank accounts in a single day.

**COUNT I**

*Against Defendants Dixon and Onyx Capital for*
*Violations of Section 17(a)(1) of the Securities Act*
*[15 U.S.C. §77q(a)(1)]*

69.     The Commission realleges and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

70.     Defendants Dixon and Onyx Capital, in the offer or sale of securities, by the use of the means and instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly employed devices, schemes or artifices to defraud.

15

71.     Dixon and Onyx Capital knowingly or recklessly engaged in the fraudulent conduct described above.

72.     By engaging in the conduct described above, Dixon and Onyx Capital have violated, and unless restrained and enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II

*Against Defendants Dixon and Onyx Capital for*
*Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act*
*[15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]*

73.     The Commission realleges and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

74.     Defendants Dixon and Onyx Capital, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers of securities.

75.     By engaging in the conduct described above, Dixon and Onyx Capital have violated, and unless restrained and enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

## COUNT III

### *Against Defendants Dixon and Onyx Capital for*
### *Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]*
### *And Rule 10b-5 Thereunder [17 C.F.R. §240.10b-5]*

76.     The Commission realleges and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

77.     Defendants Dixon and Onyx Capital, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce or of the mails, directly or indirectly: (a) used or employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud and deceit upon other persons, including current and prospective investors.

78.     Dixon and Onyx Capital knowingly or recklessly engaged in the fraudulent conduct described above.

79.     By engaging in the conduct described above, Dixon and Onyx Capital violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT IV

### *Against Defendants Dixon and Onyx Capital for*
### *Violations of Section 206(1) of the Advisers Act*
### *[15 U.S.C. §80b-6(1)]*

80.     The Commission realleges and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

81.     At all relevant times, Defendants Dixon and Onyx Capital acted as investment advisers to the Onyx Fund.  Dixon and Onyx Capital managed the investments of the Onyx Fund in exchange for compensation in the form of management fees.

82.     Dixon and Onyx Capital, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, directly or indirectly employed devices, schemes or artifices to defraud their clients or prospective clients.

83.     Dixon and Onyx Capital knowingly or recklessly engaged in the fraudulent conduct described above.

84.     By engaging in the conduct described above, Dixon and Onyx Capital violated Section 206(1) of the Advisers Act [15 U.S.C. §80b-6(1)].

## COUNT V

### *Against Defendants Dixon and Onyx Capital for Violations of Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)]*

85.     The Commission realleges and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

86.     At all relevant times, Defendants Dixon and Onyx Capital acted as investment advisers to the Onyx Fund.  Dixon and Onyx Capital managed the investments of the Onyx Fund in exchange for compensation in the form of management fees.

87.     Dixon and Onyx Capital, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.

88.     By engaging in the conduct described above, Dixon and Onyx Capital violated Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

## COUNT VI

### *Against Defendants Dixon and Onyx Capital for Violations of Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] And Rule 206(4)-8 Thereunder [17 C.F.R. §275.206(4)-8]*

89.     The Commission realleges and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

90.     At all relevant times, Defendants Dixon and Onyx Capital acted as investment advisers as defined under the Advisers Act.  Dixon and Onyx Capital managed the investments of the Onyx Fund in exchange for compensation in the form of management fees.

91.     Dixon and Onyx Capital, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, engaged in acts, practices or courses of business which were fraudulent, deceptive, or manipulative.  Dixon and Onyx Capital made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to investors or prospective investors in pooled investment vehicles, and otherwise engaged in acts, practices or courses of business that were fraudulent, deceptive, or manipulative with respect to investors or prospective investors in pooled investment vehicles.

92.     By engaging in the conduct described above, Dixon and Onyx Capital violated Section 206(4) of the Advisers Act [15 U.S.C. §80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. §275.206(4)-8].

## COUNT VII

### *Against Defendant Farr for*
### *Aiding and Abetting Violations of Section 206(1) of the Advisers Act*
### *[15 U.S.C. §80b-6(1)]*

93.    The Commission realleges and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

94.    At all relevant times, Defendants Dixon and Onyx Capital acted as investment advisers to the Funds.  Dixon and Onyx Capital managed the investments of the Onyx Fund in exchange for compensation in the form of management fees.  Dixon and Onyx Capital, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, directly or indirectly employed devices, schemes or artifices to defraud their clients or prospective clients.  Dixon and Onyx Capital knowingly or recklessly engaged in the fraudulent conduct described above.  By engaging in the conduct described above, Dixon and Onyx Capital violated Section 206(1) of the Advisers Act [15 U.S.C. §80b-6(1)].

95.    Defendant Farr, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Dixon and Onyx Capital in connection with their violations of Section 206(1) of the Advisers Act.

96.    By reason of the foregoing, Farr aided and abetted Dixon and Onyx Capital's violations of, and unless restrained and enjoined, will aid and abet further violations of Section 206(1) of the Advisers Act [15 U.S.C. §80b-6(1)].

## COUNT VIII

### *Against Defendant Farr for*
### *Aiding and Abetting Violations of Section 206(2) of the Advisers Act*
### *[15 U.S.C. §80b-6(2)]*

97.     The Commission realleges and incorporates by reference paragraphs 1 through 68 as if fully set forth herein.

98.     At all relevant times, Defendants Dixon and Onyx Capital acted as investment advisers to the Funds.  Dixon and Onyx Capital managed the investments of the Onyx Fund in exchange for compensation in the form of management fees.  Dixon and Onyx Capital, while acting as investment advisers, by use of the mails or the means and instrumentalities of interstate commerce, directly or indirectly engaged in transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients.  Dixon and Onyx Capital knowingly or recklessly engaged in the fraudulent conduct described above.  By engaging in the conduct described above, Dixon and Onyx Capital violated Section 206(2) of the Advisers Act.

99.     Defendant Farr, in the manner set forth above, knowingly or with severe recklessness provided substantial assistance to Dixon and Onyx Capital in connection with their violations of Section 206(2) of the Advisers Act.

100.     By reason of the foregoing, Farr aided and abetted Dixon and Onyx Capital's violations of, and unless restrained and enjoined, will aid and abet further violations of Section 206(2) of the Advisers Act [15 U.S.C. §80b-6(2)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission requests that this Court:

### I.

Find that Defendants Roy Dixon, Jr. and Onyx Capital Advisors, LLC violated Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2) and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. §275.206(4)-8].

### II.

Find that Defendant Michael A. Farr aided and abetted Dixon's and Onyx Capital's violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### III.

Grant a permanent injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Defendants Roy Dixon, Jr. and Onyx Capital, LLC, their agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order by personal service or otherwise, from directly or indirectly engaging in transactions, acts, practices or courses of business which violate Sections 17(a)(1), 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(1), 77q(a)(2) and 77q(a)(3)], Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)], Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], Sections 206(1), 206(2) and 206(4) of the Advisers Act [15 U.S.C. §§ 80b-6(1), 80b-6(2) and 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. §275.206(4)-8].

**IV.**

Grant a permanent injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, restraining and enjoining Defendant Michael A. Farr, his agents, servants, employees, attorneys and those persons in active concert or participation with him who receive actual notice of the Order by personal service or otherwise, from directly or indirectly engaging in transactions, acts, practices or courses of business which aid and abet violations of Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

**V.**

Issue an Order requiring Defendants Roy Dixon, Jr., Onyx Capital Advisors, LLC and Michael A. Farr to disgorge the ill-gotten gains they received, directly or indirectly, as a result of the wrongful acts, practices and courses of conduct alleged herein, with prejudgment interest.

**VI.**

Issue an order requiring Defendants Roy Dixon, Jr., Onyx Capital Advisors, LLC and Michael A. Farr to pay appropriate civil penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] and Section 209(e) of the Advisers Act [15 U.S.C. §80b-9(e)].

**VII.**

Establish a Fair Fund pursuant to Section 308 of the Sarbanes-Oxley Act of 2002, into which all disgorgement, prejudgment and post judgment interest, and civil penalties obtained through this action will be deposited and then distributed to injured investors pursuant to a plan of distribution approved by the Court.

**VIII.**

Retain jurisdiction over this action, in accordance with the principals of equity and the Federal Rules of Civil Procedure, in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or motion for addition relief, within the jurisdiction of this Court.

**IX.**

Grant such other and additional relief as this Court deems necessary and appropriate.

Respectfully Submitted,

**UNITED STATES SECURITIES AND EXCHANGE COMMISSION**

/s/***Anne C. McKinley***
Robert M. Moye (Illinois Bar No. 6225688)
Anne C. McKinley (Illinois Bar No. 6270252)
Jedediah B. Forkner (Illinois Bar No. 6299787)
Chicago Regional Office
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone:  (312) 353-7390
Facsimile:  (312) 353-7398
Email:  MoyeR@sec.gov
Email:  McKinleyA@sec.gov
Email:  ForknerJ@sec.gov


/s/ with consent of Michael J. Riordan
Michael J. Riordan (P43980)
Assistant United States Attorney
211 Fort Street, Suite 2001
Detroit, Michigan  48226
Telephone:  (313) 226-9602
Facsimile:  (313) 226-3800
Email:  Michael.Riordan@usdoj.gov