**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES SECURITIES
AND EXCHANGE COMMISSION,

    Plaintiff,

v.

ONYX CAPITAL ADVISORS, LLC,
ROY DIXON, JR. and MICHAEL A. FARR,

    Defendants.
                                            /

Case No. 10-11633

HONORABLE DENISE PAGE HOOD

**ORDER GRANTING AMENDED MOTION TO MODIFY ASSET FREEZE ORDER,
OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT,
and
ORDER SETTING DATES**

**I.    BACKGROUND**

On April 22, 2010, Plaintiff United States Security and Exchange Commission (the "SEC") filed a Complaint against Defendants Onyx Capital Advisors, LLC ("Onyx Capital"), Roy Dixon, Jr. ("Dixon") and Michael A. Farr ("Farr") (collectively "Defendants") alleging eight counts of violating the Securities Act.  Dixon is the owner and founding member of Onyx Capital, a private equity firm based in Detroit, Michigan.  Dixon is a licensed securities broker and has been employed as a registered representative at a broker-dealer based in Bloomfield Hills, Michigan.  Dixon also owned an insurance business, Onyx Financial Group, LLC, located in Detroit, Michigan, as well as numerous rental properties in Detroit and Pontiac, Michigan.  (Comp., ¶ 9)  Onyx Capital managed assets for three Detroit-area public pension funds through its position as the general partner for the Onyx Capital Advisory Fund I, LP ("Onyx Fund"), a private equity fund.  (Comp., ¶ 10)  Farr is the

President, Chief Executive Officer and sole owner of Second Chance Motors, Inc. and also controls the operations of two related companies, SCM Credit, LLC and SCM Finance, LLC, both of which provide financing support to Second Chance. (Comp., ¶ 11)

A Preliminary Injunction Order freezing assets was agreed to by the SEC and Defendants Onyx Capital and Dixon and was entered on June 4, 2010. (Doc. No. 29) To date, no appearance has been filed on behalf of Defendant Farr, although he agreed to a Preliminary Injunction Order on May 7, 2010. (Doc. No. 15) This matter is before the Court on a Motion to Modify Asset Freeze Order filed by the SEC and a Motion for Summary Judgment also filed by the SEC. Briefs have been filed and a hearing held on the matter.

## II.     SEC's AMENDED MOTION TO MODIFY ASSET FREEZE ORDER

The SEC seeks to modify the Preliminary Injunction Order freezing certain assets held by Dixon and Onyx Capital because the United States Trustee, S. Gregory Hays, appointed in Dixon's converted chapter 7 bankruptcy action in the Bankruptcy Court for the Northern District of Alabama, is required to identify and liquidate assets held by Dixon. The Preliminary Injunction Order prohibits Dixon from transferring or otherwise disposing of the funds, assets or other property. (Doc. No. 29 at 5) Without these funds, the Trustee is unable to fulfill his duties under the Bankruptcy rules and statutes. The SEC asserts that it and counsel for the pension funds that invested with Onyx Capital, have conferred and agreed to allow the Trustee to identify, locate, collect and liquidate assets of Dixon's bankruptcy estate and to pay for the Trustee and other professional fees as approved by the Bankruptcy Court. The SEC seeks to modify the Preliminary Injunction Order to add the following language:

> Notwithstanding the provisions contained in Section II of the Court's Preliminary Injunction Order Against Defendants Onyx Capital

>Advisors, LLC and Roy Dixon, Jr., S. Gregory Hays, in his role as trustee in Dixon's Chapter 7 bankruptcy case, is permitted to (a) liquidate, through sale or otherwise, any assets that constitute property of Dixon's Chapter 7 estate pursuant to the applicable provisions of the Bankruptcy Code; and (b) pay, from the proceeds of such liquidated assets, the following (with all remaining proceeds to be held by the trustee in trust pending further order of this Court): (i) any fees and expenses of the Chapter 7 trustee's professionals that are approved for payment by the bankruptcy court pursuant to Sections 330 and 331 of the Bankruptcy Code; (ii) any fee payable to the Chapter 7 trustee under Section 326 of the Bankruptcy Code that is approved by the bankruptcy court; and (iii) any amounts due to the Lenders (as defined below) under the terms of the loan agreements approved by the bankruptcy court; and (c) borrow, pursuant to Section 364(c)(1) of the Bankruptcy Code and such other terms and conditions approved by the bankruptcy court, up to $80,000 from the Onyx Fund and up to $20,000 from Onyx Capital (collectively, the "Lenders") and use the proceeds to pay any fees and expenses of the Chapter 7 trustee's professionals that are approved for payment by the bankruptcy court pursuant to Sections 330 and 331 of the Bankruptcy Code.

(SEC's Motion, Doc. No. 98, p. 4)

Dixon opposes the SEC's motion to modify the asset freeze order, claiming that the SEC is attempting to use public pension fund money in Dixon's personal chapter 11 (converted to chapter 7) bankruptcy action. Dixon claims that the funds from Onyx Capital are public pension funds and should not be used to pursue a "doubtful venture" of finding assets in Dixon's personal estate.

A trustee in a debtor's case is charged with the duty to administer assets and claims on behalf of the estate, including investigation of the financial affairs of the debtor and examining proofs of claims against the estate. 11 U.S.C. § 704. Any claims and non-exempt assets of the debtor become property of the bankruptcy estate. 11 U.S.C. § 541. The duty to maximize the distribution of liquidated assets rests with a chapter 7 trustee. *In re Hopkins,* 317 B.R. 726, 733 (Bkrtcy. E.D. Mich. 2004).

Given that the pension funds at issue, the City of Detroit General Retirement System ("Detroit GRS"), the City of Detroit Police and Fire Retirement Systems ("Detroit PFRS"), and the City of Pontiac General Employees Retirement System ("Pontiac GERS"), confirm that they do not object to the SEC's motion, the motion is granted.  It is noted that Dixon initially filed a bankruptcy action under chapter 11,  which was converted to a chapter 7 bankruptcy.  The Bankruptcy Court and the chapter 7 Trustee have the appropriate information regarding any claims or assets related to Dixon's bankruptcy estate as required by the bankruptcy statutes.  Dixon and any of his creditors have the opportunity to object to any actions by the Trustee before the Bankruptcy Court.  The SEC's motion to modify the asset freeze order is granted.

### III. SEC's MOTION FOR SUMMARY JUDGMENT AGAINST DEFENDANTS DIXON AND ONYX CAPITAL ADVISORS, LLC

#### A. Standard of Review

Rule 56(a) of the Rules of Civil Procedures provides that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The presence of factual disputes will preclude granting of summary judgment only if the disputes are genuine and concern material facts. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.  Although the Court must view the motion in the light most favorable to the nonmoving party, where "the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).  Summary judgment must be entered against a party who

fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Celotex Corp.*, 477 U.S. at 322-23. A court must look to the substantive law to identify which facts are material. *Anderson*, 477 U.S. at 248.

Federal courts hold the *pro se* complaint to a "less stringent standard" than those drafted by attorneys. *Haines v. Kerner*, 404 U.S. 519 (1972). A *pro se* litigant "must conduct enough investigation to draft pleadings that meet the requirements of the federal rules." *Burnett v. Grattan,* 468 U.S. 42, 50 (1984).

### B. Dixon's Submission of Evidence

The SEC submitted various evidence to support its summary judgment motion against Dixon and Onyx Capital, including: depositions of Elliot Fullen, Erica Robertson, Michael Farr and Roy Dixon; Roy Dixon's investigative testimony transcript; Roy Dixon Accounting; Onyx Fund General Ledger; and discovery requests to Roy Dixon. (Doc. No. 83 Exhibits) Now that the discovery deadline has passed (November 30, 2011), the SEC claims that discovery is closed. The SEC asserts that Dixon and Onyx Capital did not participate in discovery, although Dixon was deposed on April 18, 2012 after the motion was filed. (Doc. No. 113) The SEC asserts that Dixon invoked his Fifth Amendment rights against self-incrimination, refusing to answer questions during the SEC's investigation and refusing to respond to the Court's order requiring him to provide the SEC with an accounting of the money he received from Onyx Capital, the Onyx Fund and Farr. No response was submitted to any of the SEC's written discovery requests. Dixon initially refused to appear for a

deposition, but did appear at a deposition after the motion was filed. The SEC argues that the Court should not consider any evidence Dixon may submit in response to the SEC's motion for summary judgment.

In his responses and supplemental responses to the summary judgment motion, Dixon filed declarations in support of his response and various other exhibits. Dixon argued that he filed a Motion to Stay Proceedings, which the Court granted. Dixon indicated that he is now participating in discovery after the Court set aside its Order staying the case. Dixon asserts that this Court should consider the documents he submitted to his various responses to the summary judgment motion.

In a civil case, a court is permitted to draw an adverse inference against an individual who invokes the Fifth Amendment and refuses to testify in the face of incriminating evidence. *Baxter v. Palmigiano,* 425 U.S. 308, 318 (1976). Rule 37(d) of the Federal Rule of Civil Procedure provides for sanctions if parties fail to provide discovery, including prohibiting a party from supporting or opposing designated claims or defenses. Fed. R. Civ. P. 37(d)(3). Requests for admissions which are not responded to within the applicable time period conclusively establish that issue unless on motion the court permits withdrawal or amendment of the admission. *Kerry Steel, Inc. v. Paragon Industries, Inc.,* 106 F.3d 147, 154 (6th Cir. 1997).

On October 31, 2011, Dixon filed a Motion to Stay Proceedings, one month after the November 30, 2011 deadline for the close of discovery. (Doc. No. 63) The Court's first Scheduling Order was entered on November 16, 2010 one year prior to the discovery deadline of November 30, 2011. Dixon filed another Plea of Stay on December 13, 2011. (Doc. No. 68) The Court entered its order staying the case in December 2011 after the discovery deadline had passed. However, Dixon withdrew his Plea of Stay on December 13, and then again on December 27, 2011. (Doc.

6

Nos. 69, 74) Nonetheless, the Court entered its Order setting aside the stay of its order on March 14, 2012.

The SEC served Dixon with its first discovery requests on July 20, 2011. No responses were submitted to those requests or to later discovery requests by the SEC. It appears that Dixon agreed to be deposed, but failed to appear. As noted above, Dixon has now been deposed. Although Dixon has not fully participated in discovery, the Court will consider his submissions since he is proceeding *pro se,* keeping in mind that the nonmoving party must present more than a mere scintilla of evidence in support of his position to avoid summary judgment. *Harrow Prods., Inc. v. Liberty Mut. Ins. Co.,* 64 F.3d 1015, 1019 (6th Cir. 1995). The Court, however, will not consider Dixon's submission filed in support of his responses to the SEC's summary judgment motion if the submissions contradicts his deposition testimony. A party may not create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts a deposition testimony. *Reid v. Sears, Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir. 1986). Self-serving and conclusory affidavit will be disregarded since simply submitting an affidavit that contradicts a prior deposition testimony would greatly diminish the utility of summary judgment as a procedure for screening out "sham issues of fact." *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir. 1984).

  C. **<u>Anti-Fraud Provisions of the Federal Securities Laws</u>**

    1. **Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 Violations**

The SEC asserts that Dixon and Onyx Capital violated Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule10b-5 of Section 10(b).

Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule10b-5

thereunder prohibit manipulative and deceptive practices, or the making of untrue statements of material facts or omitting to state material facts, in the offer or sale, or in connection with the purchase of sale, of any security. 15 U.S.C. § 77q(a); 15 U.S.C. § 78j(b); 17 C.F.R. § 250.10b-5.

To establish violations of these anti-fraud provisions, the SEC must show that the defendants engaged in: 1) misrepresentations or omissions of material facts 2) made in connection with the offer, sale or purchase of securities 3) with *scienter* on the part of the defendants. *S.E.C. v. George,* 426 F.3d 786, 792 (6th Cir. 2005); *Ernst & Ernst v. Hochfelder,* 425 U.S. 185 (1976). A fact is "material" when a substantial likelihood exists that a reasonable shareholder would consider the fact important in making his investment decision and a reasonable shareholder would view the information as having significantly altered the total mix of information. *George,* 426 F.3d at 792; *Basic Inc. v. Levinson,* 485 U.S. 224, 231-32 (1988). The term "securities" includes investment contract, which is "an investment of money in a common enterprise with profits to come solely from the efforts of others." 15 U.S.C. § 77b(1)(1); *S.E.C. v. Edwards,* 540 U.S. 389, 393 (2004). Scienter may be established by proof of recklessness–"highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *George,* 426 F.3d at 792*; Mansbach v. Prescott, Ball & Turben,* 598 F.2d 1017, 1025 (6th Cir. 1979).

The SEC submitted evidence to show misrepresentations or omissions of material facts. In October 2006, Dixon sent letters to Detroit GRS and Detroit PFRS introducing Onyx Capital and naming Elliott Fullen as Dixon's partner. (Doc. No. 81, Stampor Decl., Ex. 1; Doc. No. 82, Thomas Decl., Ex. 1) Dixon introduced the Onyx Fund to the Pontiac GERS, providing the Pontiac GERS with a handout naming Fullen as a strategic partner of Onyx Capital. (Doc. No. 80, Zimmerman Decl., Ex. 1) In November 2006 and January 2007, the Trustees for the Pontiac GERS stated that

8

it was important that Fullen join Onyx Capital so that Onyx Capital would have someone on board with sufficient investment experience. (Doc. No. 80, Zimmerman Decl., Ex. 2 at 13-14 and Ex. 3 at 11) The Pontiac GERS initially refused Onyx Capital's capital calls. (Doc. No. 80, Zimmerman Decl., ¶ 8) The Pontiac GERS indicated in October 2007 it would not go forward without a written assurance that Fullen was a principal of Onyx Capital. (Doc. No. 80, Zimmerman Decl., Ex. 7 at 4-6)

Onyx Capital sent a letter in November 2007 to the Pontiac GERS signed by Dixon, Fullen and another individual stating that the three men owned 100% of Onyx Capital, and that 100% of their efforts were with the firm. (Doc. No. 80, Zimmerman Decl., Ex. 8; Doc. No. 83, Ex. A to Motion, Requests for Admission at ¶¶ 1, 3) Based upon this letter, the Pontiac GERS' Board of Trustees voted to fund the Onyx Fund investment. (Doc. No. 80, Zimmerman Decl., Ex. 9 at 12-13) The SEC asserts that Fullen's signature on the letter was a forgery. (Doc. No. 83, Ex. A to Motion, Requests for Admission at ¶¶ 1-24)

Fullen testified at his deposition that he agreed to advise Dixon and Onyx Capital but could not join Onyx Capital in any official capacity because he was employed by, and an officer of, another firm. (Doc. No. 80, Ex. B to Motion, Fullen Tr. at 48) Fullen was never employed by or an owner of Onyx Capital and never received any compensation from Onyx Capital. (*Id.* at 24-25) Fullen did not sign or authorized anyone to sign the November 2007 letter to the Pontiac GERS. (*Id.* at 80-82) Fullen's name is misspelled on the letter. (*Id.* at 81) When the Pontiac GERS learned in June 2009 that Fullen was never employed by Onyx Capital and that he did not sign the November 2007 letter, the Pontiac GERS notified Dixon and Onyx Capital it would no longer fund any capital calls and it was freezing its investment at the current level. (Doc. No. 80, Zimmerman

9

Decl., Ex. 13)

The SEC further submitted evidence to show that Onyx Capital and Dixon issued false and misleading capital calls. Article 3.1(a) of the Partnership Agreement allowed Onyx Capital to issue "capital calls" to the pension funds, as needed to fund a particular investment or to pay management fees. (Doc. No. 80, Zimmerman Decl., Ex. 5; Doc. No. 83, Ex. A to Motion, Requests for Admission at ¶ 25) Onyx Capital was required to detail the anticipated uses of the funds requested and seek the funds *pro rata* from each of the pension fund based on its capital commitment. (Doc. No. 80, Zimmerman Decl., Ex. 5; Doc. No. 83, Ex. A to Motion, Requests for Admission at ¶ 26)

The capital calls issued to the Pontiac GERS misrepresented the actual amounts requested from the other two pension funds and misstated all three pension funds' *pro rata* contribution amounts. (Doc. No. 3, Holland Decl., ¶ 35); Doc. No. 83, Ex. A to Motion, Requests for Admission at ¶ 30) Dixon and Onyx Capital represented that the auto finance company deal required a $7 million investment. (Doc. No. 3, Holland Dec., ¶ 36). Dixon and Onyx Capital advised the Pontiac GERS that $2.77 million had been requested from each of the other two pension funds to invest in the $7 million deal. (Doc. No. 80, Zimmerman Decl., Ex. 10) However, Dixon and Onyx Capital had requested and received approximately $3.5 million each from Detroit GRS and Detroit PFRS for the purported $7 million investment, raising a total of $8.29 million. (Doc. No. 3, Holland Decl., ¶ 36; Doc. No. 81, Stampor Decl., Ex. 4; Doc. No. 82, Thomas Decl., Ex. 4) The contributions were not *pro rata* and Dixon and Onyx Capital actually invested the money into SCM Credit, not in an auto finance company deal as represented by Dixon and Onyx Capital. (Doc. No. 3, Holland Decl., ¶ 30; Doc. No. 80, Zimmerman Decl. at ¶ 18)

Dixon asserts that the SEC's allegation that he acted as an investment advisor to the Onyx

Fund is false. Dixon claims he was employed by and a member of Onyx Capital. Dixon states that he did not receive any fees for his work with Onyx Capital. Dixon further claims that the Onyx Capital Fund's portfolio consisting of SCM entities, Hi-Tec and Associates and Galaxy Holdings were not securities. Dixon submitted various declarations indicating that Fullen was his teammate and classmate while at Northwestern University in 1983.

In May 2006, Dixon states that he decided to start a private equity company, contacting Fullen to be a part of the company. Dixon asserts that he and Fullen agreed to be partners. In the summer of 2006, Dixon, Fullen and Larry Gray met in Chicago, Illinois at which time Gray told Dixon and Fullen that his client was the Pontiac GERS. Dixon asserts that Gray performed due diligence regarding Onyx Capital. Dixon asserts that Adrian Anderson of North Point Advisors acted as a consultant for the Detroit PFRS and Detroit GRS and that due diligence was performed on Dixon in November 2006. Dixon claims that he and Onyx Capital fully disclosed Fullen's role as a Strategic Partner to the Limited Partners. Dixon asserts that Fullen participated in raising funds and Fullen acknowledged he was a principal/partner on conference calls with the State of Michigan and Credit Suisse in 2007.

Dixon claims that Fullen gave Dixon permission to sign his name on the November 2007 letter to the Pontiac GERS. Dixon, however, asserts he did not sign Fullen's name. At his deposition, Dixon testified that Dixon's administrative assistance signed Fullen's name. (Doc. No. 113, Dixon Dep. at 115-16) Dixon testified that the November 2007 letter to the Pontiac GERS was merely an "intention" that he and Fullen would share the company's ownership and devote 100% of their efforts to the company "in the future." (Doc. No. 113, Dixon Dep. at 110-11, 118-24) Dixon argues that it is Fullen who has engaged in a series of false statements in his December 7,

2009 deposition.

The Court finds that the SEC sufficiently supported its claim that Dixon and Onyx Capital made misrepresentations to the three funds at issue. The SEC supported its argument that the statements were "material" given that the Pontiac GERS required written confirmation that Fullen was a principal of Onyx Capital before agreeing to invest with Onyx Capital. There is no genuine issue of material fact that Fullen's signature was forged and not authorized by Fullen. There is also no genuine issue of material fact that the misrepresentations were made in connection with the offer, sale or purchase of securities, given that the Pontiac GERS was not going to fund the investment without written assurance that Fullen was a principal of Onyx Capital. In addition, the call letters to all three pension funds were made in connection with the purchase or sale of securities.

As to the *scienter* requirement, there is no genuine issue of material fact that Dixon has controlled Onyx Capital since its inception. Dixon had knowledge that Fullen had not signed the letter provided to the Pontiac GERS. Dixon knew the amount of money actually invested by each client, misstating the amounts so that Dixon could raise more money than the purported amount for his own purpose. Dixon also failed to invest the money in the represented investment but instead invested the money into SCM Credit, without the funds' knowledge. The SEC has shown sufficient facts to establish that Dixon and Onyx Capital's actions meet the *scienter* requirement.

Dixon's submissions and declaration do not create genuine issues of material fact that he and Onyx Capital made material misrepresentations about Fullen's role with Onyx Capital. Dixon admits that Fullen did not sign the November 5, 2007 letter to the Pontiac GERS. Dixon's testimony at his deposition that the November 2007 letter represented an "intention" in the "future" as to who owned Onyx Capital is without merit. The November 25, 2007 letter is in the present tense, stating,

"[t]his is to advise you that 100% ownership of Onyx Capital Advisors, LLC *is* held by Roy Dixon, Elliot K. Fullen and LaRoy A. Williams." (Doc. No. 80, Zimmerman Decl., Ex. 9) Dixon's submissions and declarations are self-serving and conclusory and do not create a genuine issue of material fact that he and Onyx Capital (which he cannot represent), violated the antifraud provisions of the Securities Act and the Exchange Act. Summary judgment is entered in favor of the SEC.

### 2. Sections 206(1) and 206(2) of the Advisors Act

Section 206(1) of the Investment Advisers Act prohibits any investment advisor from, directly or indirectly, employing any device, scheme or artifice to defraud any client or prospective client. 15 U.S.C. § 80b-6(1). Section 206(2) prohibits any transaction, practice or course of business which operates as a fraud or deceit upon any client or prospective client. 15 U.S.C. § 80b-6(2). *Scienter* is required for violation of Section 206(1), but not for a violation of Section 206(2). *S.E.C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 191-92 (1963).

In their Answer to the Complaint, Dixon and Onyx Capital admitted they were investment advisers. (Doc. No. 25, Answer, ¶ 94) The SEC submitted evidence to show that Dixon and Onyx Capital misappropriated money from the Onyx Fund. Article 5 of the Partnership Agreement provided that Onyx Capital was entitled to an annual management fee of 2% of the committed capital in the Onyx Fund, payable quarterly. (Doc. No. 80, Zimmerman Decl., Ex. 5) Article 6.8 expressly prohibited Onyx Capital from borrowing any money from the Onyx Fund. (Doc. No. 80, Zimmerman Decl., Ex. 5) Based on total commitments of $25 million, Onyx Capital was entitled to management fees of $291,667 for 2007, $500,000 for 2008 and $500,000 for 2008, approximately $1.3 million. (Doc. No. 3, Holland Decl., ¶ 18) Onyx Capital withdrew more than $4.6 million from the Onyx Fund's bank accounts between 2007 and 2009. (Doc. No. 3, Holland Decl., ¶¶ 18, 55)

Dixon withdrew at least $920,000 from the Onyx Fund's bank accounts and deposited the funds directly into his personal bank accounts or to accounts in the names of his other businesses. (Doc. No. 3, Holland Decl., ¶¶ 57-59, 63-64). Dixon and Onyx Capital commingled the Onyx Fund's investment money with Onyx Capital's own funds, and used the Onyx Fund's investment money for their own purposes. (Doc. No. 83, Ex. C to Motion, Robertson Tr. at 26-30) Dixon admitted that he owned money to Onyx Fund. (Doc. No. 83, Ex. C to Motion, Robertson Tr. at 55)

Dixon and Onyx Capital invested in Farr's companies, in the amount of $15.7 million between 2007 and 2009. (Doc. No. 25, Answer, ¶ 25) The majority of the money was transferred to Farr's Second Chance entities without an agreement in place defining anything that Onyx Fund would receive in return for its "investments." (Doc. No. 80, Ex. D to Motion, Farr Tr. at 66) Dixon began preparing investment agreements between the Onyx Fund and the Second Chance entities during the SEC's initial investigations. (*Id.* at 68-69) In 2008, Dixon told Farr he needed funds to complete the construction of his new home in Atlanta, Georgia and Dixon asked Farr to make certain payments on his behalf to construction contractors. (*Id.* at 141-44, 152-53, 164) Dixon and Onyx Capital transferred money from the Onyx Fund to one of the Second Chance entities purportedly for investment purposes. (*Id.* at 152-53). Farr then transferred the money from his entities to pay Dixon's construction contractors. (*Id.* at 152-53, 164) Between October 2008 and December 2008, Farr made payments totaling $513,426.10 to three construction companies that performed work on Dixon's house. (*Id.* at 141) During the SEC's initial investigation, Farr and Dixon executed a backdated promissory note which required Dixon to repay the money to Sea Jay, one of Farr's entities, with interest. (*Id.* at 155-59) Farr also made a series of withdrawals from the Second Chance entities, providing cash to Dixon. (*Id.* at 168) Dixon explained to Farr that the Onyx Fund

14

was short and that Dixon needed the cash that the Onyx Fund had provided to Second Chance entities. (*Id.* at 169-71) Farr indicated that Dixon was returning money to the Onyx Fund and wanted to use cash to obscure the source of the money. (*Id.* at 170-72)

Dixon asserts in his submissions that Farr's testimony is false that Dixon began preparing investment agreements between Onyx Capital Fund and the Second Chance Entities during the SEC's investigation and that Dixon had told Farr that he needed money to complete the construction of Dixon's home. At his deposition, Dixon testified that he was building a new home in Atlanta, Georgia in 2008 and that the cost to build the home was in excess of $3 million. (Doc. No. 113, Dixon Tr. at 259) Dixon acknowledged that he was aware Farr used ht money that the Onyx Fund invested in Farr's used-car companies to make payments toward the construction of Dixon's home. (Doc. No. 113, Dixon Tr. at 260-66) Dixon testified that Farr used Onyx Fund investment money to deliver cash to Dixon and Onyx Capital in December 2008. (Doc. No. 113, Dixon Tr. at 264) Dixon insisted that Farr could do whatever he wanted with the money that the Onyx Fund invested in Farr's businesses. (Doc. No. 113, Dixon Tr. at 264)

The SEC submitted sufficient evidence to show that Dixon and Onyx Capital have misappropriated funds from the Onyx Fund, in violation of the Investment Advisers Act. The SEC also submitted sufficient evidence to show *scienter*. Dixon's submissions are self-serving and conclusory and do not create a genuine issue of material fact since Dixon cannot show that the Partnership Agreement or the Investment Advisers Act allows an investment adviser to use the money for personal purposes or to allow others to divert investor funds for personal benefit. The SEC is entitled to summary judgment on its claim that Dixon and Onyx Capital violated Sections 206(1) and 206(2) of the Advisers Act. Summary judgment is entered in favor of the SEC.

### 3. Section 206(4) of the Advisers Act and Rule 206(4)-8 Violations

Section 206(4) of the Advisers Act prohibits an investment adviser from, directly or indirectly, engaging in any act, practice or course of business which is fraudulent, deceptive, or manipulative. 15 U.S.C. § 80b-6(4). Rule 206(4)-8 thereunder defines prohibited conduct as making false or misleading statements or otherwise defrauding investors or prospective investors in pooled investment vehicles. 17 C.F.R. § 275.206(4)-8. *Scienter* is not required.

The SEC claims that Dixon and Onyx Capital violated these Sections by making false and misleading statements to the pension funds about Fullen's role with Onyx Capital, the amounts and uses of the pension funds money and the amount of management fees taken. For the same reasons set forth above, the SEC has submitted sufficient evidence to show a violation of Section 206(4) of the Advisers Act and Rule 206(4)-8 thereunder.

### D. Relief Requested

The SEC requests a permanent injunction against both Dixon and Onyx Capital prohibiting future violations of the Acts noted and disgorgement in the amount of $3,112,343 ($2,063,543 in excess management fees and $1,048,800 in misappropriation monies through the Farr companies). The SEC also seeks civil penalties. The SEC indicated it would submit further documentation on the penalties. A Judgment will be entered when all the claims are resolved against all parties.

## IV. CONCLUSION

For the reasons set forth above,

IT IS ORDERED that the United States Securities and Exchange Commission's Amended Motion for Order Modifying Asset Freeze Order **(Doc. No. 98)** is GRANTED.

IT IS FURTHER ORDERED that the United States Securities and Exchange Commission's

Motion for Summary Judgment against Roy Dixon, Jr. and Onyx Capital Advisors, LLC (**Doc. No. 83**) is GRANTED.

IT IS FURTHER ORDERED that the SEC file further documentation on the penalties and a separate report as to the remaining issues/claims/parties remaining (with a proposed schedule to further litigate these issues) by **December 7, 2012.**

S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: October 11, 2012

I hereby certify that a copy of the foregoing document was served upon counsel of record on October 11, 2012, by electronic and/or ordinary mail.

S/LaShawn R. Saulsberry
Case Manager

17